IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:16-CT-03101-FL

ISAAC H. OLIVER,                                    )
                                                    )
                Plaintiff,                          )
                                                    )
        v.                                          )                ORDER
                                                    )
FAYE DANIELS, Superintendent;                       )
LAUREN HARRELL, Asst. Superintendent               )
of Programs; DR. RICHARD O.                         )
BROADWELL, III; and ALICE MUSSARI,                 )
Supervising Nurse,[1]                               )
                                                    )
                Defendants.

The matter now comes before the court on defendant Dr. Richard O. Broadwell, III's

("Broadwell") motion for summary judgment (DE 64), plaintiff's motion to dismiss his claims

against Nurse Alice Mussari ("Mussari") (DE 73), and a motion for summary judgment filed by

defendants Mussari, Superintendent Fay Daniels ("Daniels"), and Assistant Superintendent Lauren

Harrell ("Harrell") (DE 82). The issues raised have been briefed fully and are ripe for adjudication.

For the following reasons, defendants' motions are granted and plaintiff's motion is denied.

## STATEMENT OF THE CASE

On May 2, 2016, plaintiff, a state inmate, filed this civil rights action pro se pursuant to 42

U.S.C. § 1983, asserting claims for deliberate indifference to medical needs and cruel and unusual

punishment related to severe back and hip pain plaintiff experienced at Pamlico Correctional

---

[1] The court constructively has amended the caption of this order to reflect dismissal of previously-named defendants, as set forth in more detail herein.

Institution ("Pamlico") beginning in July 2013. The court denied initial motions for a temporary restraining order and for appointment of counsel. Plaintiff filed amended complaint on January 3, 2017. On January 26, 2017, the court conducted its initial review, dismissed plaintiff's claims against the Jane and John Doe defendants without prejudice, and continued management of plaintiff's deliberate indifference claims against the other defendants. On June 27, 2017, the court also dismissed former defendant Barbara Messer without prejudice. On March 26, 2018, the court granted defendant Broadwell's motion to dismiss as to plaintiff's official capacity claims but denied the motion as to defendant Broadwell's alleged deliberate indifference and claim of qualified immunity.

On November 26, 2018, defendant Broadwell filed the instant motion for summary judgment and attached a memorandum in support, a statement of material facts citing to publically available records and record evidence, an appendix to the statement of material facts including defendant Broadwell's affidavit, and plaintiff's medical records. On January 7, 2019, plaintiff filed the instant motion to dismiss defendant Mussari as a defendant in this action, a response in opposition to defendant Broadwell's motion for summary judgment, and a statement of material facts that includes plaintiff's affidavit and various exhibits including medical records. On January 28, 2019, defendant Broadwell filed a reply and a response to plaintiff's statement of material facts.

On February 8, 2019, defendants Daniels, Harrell, and Mussari filed the instant motion for summary judgment, a memorandum in support, a statement of material facts, an appendix to the statement of material facts including affidavits of Daniels, Harrell, and Mussari, and sealed exhibits comprising medical records and inmate request forms.

On March 11, 2019, plaintiff filed a sur-reply to defendant Broadwell's response to plaintiff's statement of material facts.

On April 8, 2019, plaintiff filed a response in opposition to the motion for summary judgment filed by defendants Daniels, Harrell, and Mussari, relying upon the following: an opposition to these defendants' statement of material facts, and an appendix containing inmate grievances, as well as declarations of plaintiff and plaintiff's mother.

On April 22, 2019, defendants Daniels, Harrell, and Mussari filed a reply and, on May 6, 2019, plaintiff filed a sur-reply.

## STATEMENT OF THE FACTS

In July 2013, plaintiff noted a bulge protruding from his lower back and hip. (Am. Compl. (DE 17) ¶11).[2] In a subsequent grievance, plaintiff stated it was the "same back injury [he] sustained working out." (See Compl. Attach (DE 1-1) at 2).[3] On July 22, 2013, plaintiff submitted a sick-call request complaining of "severe back and hip pain" and requesting an MRI. (Am. Compl. (DE 17) ¶11; Broadwell Aff. (DE 67-1) ¶7; Broadwell Ex. 3 (DE 68-3) (July 22, 2013, sick-call request)).

On July 31, 2013, defendant Mussari examined plaintiff, recorded complaints of flank pain and a mass in his hip area, and noted his history of degenerative disc disease and a prior Utilization Review ("UR") Board approval for orthotic shoes after ineffective surgery for bilateral hammer toes. (Broadwell Ex. 3 (DE 68-3)). Defendant Mussari referred plaintiff's chart to defendant Broadwell, a licensed physician, for review. (Broadwell Aff. (DE 67-1) at ¶¶3–4, 7; Am. Compl. (DE 17) ¶11)).

---

[2] Plaintiff's amended complaint is verified.

[3] Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to the page numbering, if any, specified on the face of the underlying document.

On August 1, 2013, defendant Broadwell reviewed plaintiff's chart, scheduled a physician's clinic appointment, and ordered a urinalysis and complete blood count to rule out a urinary tract infection as a potential cause of plaintiff's back pain. (See Broadwell Aff. (DE 67-1) ¶8).

On August 15, 2013, defendant Broadwell examined plaintiff for back and hip pain, noted tenderness on palpation of the right paraspinal muscles, observed a flexion deformity on plaintiff's left second toe, and noted a November 29, 2012, x-ray revealing degenerative disc disease.[4] (Id. at ¶9; Broadwell Ex. 5 (DE 68-5) (progress note dated August 15, 2013)). Defendant Broadwell: noted plaintiff denied symptoms indicative of neuropathy or neurologic impairment; observed plaintiff's recent weightlifting and heavily muscled frame were inconsistent with plaintiff's reported history; and, because plaintiff was seeking pain medication, noted plaintiff's history of drug abuse. (Broadwell Aff. (DE 67-1) ¶9). Defendant Broadwell assessed plaintiff with: non-specific chronic lower back pain and deformity of the left second toe. (Id.). Defendant Broadwell referred plaintiff for a podiatry consultation,[5] ordered tests to check for underlying infections or inflammatory conditions,[6] and ordered an x-ray for the right hip.[7] (Id.). Defendant Broadwell also wrote plaintiff

---

[4] Defendant Broadwell avers: "degenerative disc disease is a condition that occurs when the discs between the vertebrae of the spinal column deteriorate, which can cause back pain." (Broadwell Aff. (DE 80-1) ¶4). Although back pain is a common complaint of North Carolina inmates, "surgery is not a routine treatment for back pain, but is a treatment of last resort. . . . [r]eserved for instances in which back pain is related to an urgent neurologic defect that likely will become irreversible in the absence of surgery." (Id.). Defendant Broadwell further avers: "Back surgery would be appropriately considered in the presence of the loss of bowel function and/or sensory deficits presumed to be related to an urgent back condition or with pain so severe that the patient was unable to walk or stand and experienced neurologic impairment. In the absence of those indications, other treatment modalities such as medication and/or physical therapy are appropriate." (Id.).

[5] The podiatry referral was rejected by the UR Board. (Broadwell Aff. (DE 67-1) ¶9 at n.5). The UR Board subsequently approved orthotic shoes that were delivered to plaintiff on September 27, 2013. (Id.).

[6] These tests were essentially normal and required no further treatment. (Broadwell Aff. (DE 67-1) ¶9).

[7] Defendant Broadwell avers that, in his professional medical opinion, the performance of an MRI on plaintiff was not medically appropriate prior to the performance of an x-ray. (Broadwell Aff. (DE 67-1) ¶9).

a six-month prescription for Naprosyn, a non-steroidal anti-inflammatory pain medication.[8]  (Id.; Broadwell Ex. 4 (DE 68-4)).

An August 22, 2013, x-ray report for plaintiff's right hip revealed a "soft tissue calcific body" near the greater trocahanter, possibly as a result of prior soft-tissue damage.  (Broadwell Ex. 6 (DE 68-6).  After reviewing the radiologist's report and the x-ray, defendant Broadwell determined that no orthopedic consultation was required.[9]  (Broadwell Aff. (DE 67-1) ¶10).

After a September 3, 2013, sick-call request for hip pain, (Broadwell Ex. 7 (DE 68-7)), defendant Mussari referred the complaint to defendant Broadwell as non-urgent and directed plaintiff to continue with prescribed treatment.  (Broadwell Aff. (DE 67-1) ¶11; Broadwell Ex. 8 (DE 68-8)).

On September 9, 2013, plaintiff declared a medical emergency due to severe hip and back pain.  (Broadwell Aff. (DE 67-1) ¶12; Am. Compl. (DE 17) ¶14).  Via telephone, defendant Broadwell ordered that plaintiff be transported to East Carolina Medical Center.  (Broadwell Aff. (DE 67-1) ¶12).  A Physician's Assistant ("P.A.") diagnosed "muscle spasms of the back and back pain (not otherwise specified)."  (Broadwell Ex. 8 (DE 68-8) at 11, 13 (emergency department note)).  Plaintiff received an injection of Toradol, a non-steroidal anti-inflammatory medication for pain and inflamation.  (Id. at 9).  The P.A. recommended oral doses of Toradol for pain and Robaxin, a muscle relaxant, for stiffness or muscle spasms.  (Id. at 13; Broadwell Aff. (DE 67-1) ¶12).  Plaintiff declined the P.A.'s recommendation for an injection of Solumedrol, a corticosteroid used

---

[8] Plaintiff regularly identifies this medication as "naproxen."  (See, e.g., Am. Compl. (DE 17) ¶12).

[9] Although plaintiff alleges he was "told that the calcification build up could be pressing against [his] sciatic nerve" (Am. Compl. (DE 17) ¶12), Broadwell avers that "the x-ray did not indicate that any structure observed was pressing on his sciatic nerve."  (Broadwell Aff. (DE 67-1) ¶10).

to treat inflamation.[10]  (Broadwell Aff. (DE 67-1) ¶12; Broadwell Ex. 8 (DE 68-8) at 10).  Based upon the P.A.'s recommendations, defendant Broadwell entered an order for plaintiff to take Flexeril, a muscle relaxant similar to Robaxin, two times a day for seven days.[11]  (Broadwell Aff. (DE 67-1) ¶12; Broadwell Ex. 8 (DE 68-8) at 4 (provider order dated September 9, 2013), 16 (record showing administration of Flexeril to plaintiff between September 9 and September 16)).  Plaintiff was discharged in stable condition and returned to Pamlico in a wheelchair.  (Broadwell Aff. (DE 67-1) ¶12.  Later that evening, a nurse informed plaintiff he could not remain at Pamlico in a wheelchair and would either need to use a cane or be transferred to a different facility.  (Broadwell Ex. 8 (DE 68-8) at 3 (medical note dated September 9, 2013, at 19:30)).  Plaintiff elected to use a cane and one was issued for use until September 12, 2013.  (Broadwell Aff. (DE 67-1) ¶12).

On September 12, 2013, although plaintiff had been "instructed to avoid weights/heavy lifting, outdoor sports and recreational activities for fourteen days," a nurse noted observing plaintiff on the basketball court wearing sneakers, shorts, and a T-shirt while bouncing and passing a basketball.  (Id. at ¶13).  When plaintiff noticed he was being observed, he "rapidly walked to the door and stated, 'I'm not playing!  I'm the coach.  I'm coaching.'" (Broadwell Ex. 8 (DE 68-8) at 3).

---

[10] Plaintiff alleges that he received "Tylenol" at East Carolina Medical Center.  Plaintiff further alleges that the doctor recommended an MRI, but "did not have the authority to administer one for me."  (Am. Compl. (DE 17) ¶14).  Neither of these allegations are supported by the record evidence of this encounter. (See Broadwell Ex. 8 (DE 68-8) at 7–14 (September 9, 2013, emergency department note)).

[11] Defendant Broadwell avers that, in his professional medical opinion, the P.A.'s recommendation of oral Toradol was unnecessary because: 1) plaintiff had an active prescription for Naprosyn; 2) he had received a Toradol shot in his emergency encounter, and 3) he had been prescribed Flexeril.  (Broadwell Aff. (DE 67-1) ¶11).

On September 22, 2013, plaintiff entered a sick-call request as to back pain stating that, when he was at the hospital, a CT scan or an MRI was recommended. (See Broadwell Ex. 9 (DE 68-9)). On October 1, 2013, plaintiff was seen by defendant Mussari in response to this request. (Id.). Defendant Mussari found no recommendation of a CT scan or MRI in the records, advised plaintiff to "avoid extreme sports and activities," and counseled plaintiff to continue with his treatment plan. (Id.). Plaintiff's request was not referred to defendant Broadwell. (Broadwell Aff. (DE 67-1) ¶14).

On October 31, 2013, plaintiff was seen by a nurse after he injured his lip playing basketball. (Broadwell Ex. 10 (DE 68-10) at 2). Defendant Broadwell directed that plaintiff be transported to an emergency room. (Broadwell Aff. (DE 67-1) ¶15). Plaintiff was: treated by a P.A.; diagnosed with a "complicated lip laceration" that was sutured; given a prophylactic tetanus immunization; prescribed an oral antibiotic; and informed he could take Tylenol or Motrin as directed. (Broadwell Ex. 10 (DE 68-10) at 7). Back at Pamlico, plaintiff received an ice pack and Ibuprofen. (Id. at 2–3).

On January 14, 2014, plaintiff submitted a sick-call request alleging, among other things, that he is still suffering from severe lower back and hip pain and "possibly nerve damage." (Broadwell Ex. 12 (DE 68-12) at 2). On January 20, 2014, defendant Mussari noted that plaintiff was a "no-show" at his scheduled appointment to address these concerns.[12] (Id.).

---

[12] Plaintiff alleges that, on or about November 1, 2013, he submitted a sick-call request as to severe back and hip pain and that, a week later, defendant Broadwell prescribed "flexoral" (See Am. Compl. (DE 17) ¶15). Plaintiff asserts he took "flexoral" for a week, it did not relieve his pain, and that this medication was ineffective. (Id.). Plaintiff also asserts that, in March 2014, "four months had passed since my last submitted sick call or since anything was prescribed to me to relieve my pain. Also, I had not yet been screened for the sick call submitted on November 1st 2013 and during all of that time I remained in constant pain." (Id. at ¶16). Defendant Broadwell avers: plaintiff did not submit a sick-call request for back and hip pain circa November 1, 2013; when defendant Broadwell removed the sutures from plaintiff's lip on November 6, 2013, plaintiff did not complain of back or hip pain; and that, between November 6, 2013, and March 14, 2014, plaintiff was prescribed Naprosyn for pain. (Broadwell Aff. (DE 67-1) ¶¶16–18). The record supports defendant Broadwell's affidavit. (Broadwell Ex. 10 (DE 68-10) at 3 (noting removal of sutures), Ex. 11 (DE 68-11) at 4–8 (medication administration record from Nov. 2013 to Mar. 2014 showing prescriptions of Naprosyn and an antibiotic immediately after the lip injury, but not Flexeril)).

On March 3, 2014, plaintiff submitted a sick-call request asserting, in relevant part: he has complained of severe back and hip pain for the past two years; his buttocks muscles are always sore and tight; and that he needs to see a specialist. (See Broadwell Ex. 13 (DE 68-13); Am. Compl. (DE 17) ¶17). In a nurse examination on March 10, 2014, defendant Mussari noted a painful lump on plaintiff's right hip, entered an order for Ibuprofen, and informed plaintiff his chart would be referred to defendant Broadwell for renewal of Naprosyn. (See Broadwell Aff. (DE 67-1) ¶21; see also Am. Compl. (DE 17) ¶17; Broadwell Ex. 13 (DE 68-13)). On March 13, 2014, defendant Broadwell reviewed defendant Mussari's March 10, 2014, referral and entered a six-month order for Naprosyn twice-a-day as needed.[13] (Broadwell Aff. (DE 67-1) ¶21; Broadwell Ex. 14 (DE 68-14) at 2).

On July 21, 2014, defendant Mussari examined plaintiff in response to a July 9, 2014, sick-call request asserting back pain and alleging that the prescribed medication "doesn't work for [his] condition." (Broadwell Ex. 15 (DE 68-15) at 2; see also Am. Compl. (DE 17) ¶19; Broadwell Aff. (DE 67-1) ¶24). On July 24, 2014, defendant Broadwell reviewed this referral and prescribed Elavil for pain.[14] (Broadwell Aff. (DE 67-1) ¶25). On July 30, plaintiff was seen by a nurse for complaints of side-effects of Elavil, including hallucinations and night sweats. (Id. at ¶26; see also Am. Compl. (DE 17) ¶18). Plaintiff signed a form noting his refusal to take Elavil due to these side-effects. (Am. Compl. (DE 17) ¶18; Broadwell Aff. (DE 67-1) ¶26 (noting defendant Broadwell: entered an order discontinuing Elavil based on plaintiff's asserted reaction to the medication and entered a six-

---

[13] Plaintiff alleges he endured hip and back pain between March 2014 and July 2014 without any prescription except for the ineffective "flexoral." (Am. Compl. (DE 17) ¶18). The record indicates Flexeril was not prescribed in this time-frame, but that plaintiff was prescribed Naprosyn, supporting defendant Broadwell's affidavit. (Broadwell Ex. 14 (DE 68-14) at 2).

[14] Plaintiff refers to this drug as "elivil." (See, e.g., Am. Compl. (DE 17) ¶20).

month prescription of Tegretol for pain instead); see also Broadwell Ex. 10 (DE 68-10), Ex. 14 (DE 68-14), Ex. 16 (DE 68-16)). On August 1, 2014, plaintiff signed a form noting he declined to take Tegretol because, plaintiff asserted, this medication only temporarily relieved the pain instead of healing the injury. (Broadwell Aff. (DE 67-1) ¶27). Defendant Broadwell discontinued the prescription of Tegretol on August 6, 2014. (Id.; see Broadwell Ex. 14 (DE 68-14), Broadwell Ex. 17 (DE 68-17)).

On August 4, 2014, plaintiff was seen by a nurse for a sick-call request entered July 24, 2014, alleging back and hip pain and asserting that the doctor refused to see him. (See Broadwell Ex. 18 (DE 68-18)). Plaintiff requested an MRI, not just pain medication. (Id.). The nurse: observed no distress or difficulty while sitting or standing and a normal gait; diagnosed lower back pain; and informed plaintiff his chart would be referred to defendant Broadwell. (Id.). Defendant Broadwell reviewed the chart on August 7, 2014, and scheduled plaintiff for a "physician's appointment in three weeks." (Broadwell Aff. (DE 67-1) ¶29; Broadwell Ex. 14 (DE 68-14)).


On August 6, 2014, plaintiff filed a grievance stating, in relevant part: he is receiving inadequate treatment at Pamlico for a back injury sustained while working out; defendant Broadwell has not examined plaintiff but prescribed ineffective medications; x-rays showed "degenerative disc" and "calcification build up"; and that he needs an MRI for his back injury. (Defs.' App. (DE 85-1) at 1). The grievance response states: at East Carolina Medical Center, no deformities were found and plaintiff was found to suffer from "muscle spasms"; on September 19, 2013, while plaintiff was subject to medical restrictions, plaintiff was observed playing basketball; and plaintiff refused to

take the prescribed medication and was "noncompliant with the providers orders as charted in you[r] medical jacket by the facility provider."[15] (Compl. Attach. (DE 1-1) at 3).

On August 27, 2014, defendant Broadwell examined plaintiff. (Am. Compl. (DE 17) ¶22; Broadwell Aff. (DE 67-1) ¶31; Broadwell Ex. 19 (DE 68-19) (provider progress note)). Defendant Broadwell noted plaintiff's report of chronic low back pain with no recent injury and plaintiff's statement that his pain decreases when he works out or plays basketball. (Broadwell Aff. (DE 67-1) ¶31). Defendant Broadwell also noted that, on August 21, 2014, a custody officer observed plaintiff playing outdoor basketball and recorded a video. (Id.; see Broadwell Ex. 10 (DE 68-10) (healthcare notes entry on August 21, 2014)). Defendant Broadwell reviewed this video before plaintiff's appointment. (See Broadwell Aff. (DE 67-1) at ¶31, n.13). Defendant Broadwell noted plaintiff "running, jumping for rebounds, [and] vigorously engaged in [the] game." (Broadwell Ex. 19 (DE 68-19) at 2). Defendant Broadwell assessed plaintiff with chronic non-specific back pain and entered a UR Board request for an orthopedic consultation to determine the etiology of plaintiff's hip calcification and any treatment recommendation.[16] (Id.). On October 8, 2014, the UR Board denied the orthopedic referral request due to plaintiff's "high level of function." (Id. at 5).

On January 2, 2015, plaintiff was seen by a nurse for a December 22, 2014, sick-call request complaining of numbness in his hands. (Broadwell Ex. 20 (DE 68-20)). Plaintiff asked why the orthopedist referral was denied. (Id.). The nurse noted plaintiff's complaints of back pain and hand numbness, recorded plaintiff's statement that he had not played basketball for eight months, and

---

[15] Plaintiff disagrees with this response, asserting that: prior x-rays indicate a degenerative condition, he was not playing basketball but merely bouncing a ball, and that the purported refusal to take medication was actually his request to be taken off of Elavil due to the undesirable side effects. (Am. Compl. (DE 17) ¶21).

[16] Defendant Broadwell avers that, in his professional medical opinion, because plaintiff "had normal function and was active in sports," plaintiff required no further treatment for back pain and, because plaintiff did not describe symptoms of neurological impairment, an MRI also was not warranted. (Broadwell Aff. (DE 67-1) ¶31).

referred to defendant Broadwell for reconsideration of the UR Board denial for an orthopedic consultation. (Id.). On February 2, 2015, defendant Broadwell reviewed plaintiff's chart as to this referral. (Broadwell Aff. (DE 67-1) ¶34). Defendant Broadwell avers he declined to appeal the UR Board denial because plaintiff neither alleged new symptoms nor showed any sufficient changes in function in the prior four months that would merit orthopedic consultation. (Id.). Instead, to manage plaintiff's complaints of pain, defendant Broadwell entered a three-day prescription for Toradol and a four-month prescription for Naprosyn. (Id.; see also Broadwell Ex. 21 (DE 68-21)).

On April 20, 2015, plaintiff was seen by a nurse for an April 7, 2015, sick-call request. (Broadwell Ex. 22 (DE 68-22) at 2). Plaintiff alleged extreme back pain and spasms he ascribed to his hip calcification pushing on his nerves. (Id.). Plaintiff complained of numbness in his hands, buttocks, and thighs, and claimed that his hip calcification had grown. (Id. at 3). The nurse noted: plaintiff's posture, stance, and gait were normal; plaintiff had symmetrical strides and walked heel to toe; plaintiff did not show signs of "unsteadiness, guarding, shuffling, limping, or irregularity in the timing of his stride." (Id. at 5). The nurse referred plaintiff's requests for an orthopaedic consultation and an x-ray. (Id.). On May 7, 2015, defendant Broadwell reviewed the April 20, 2015, referral, submitted a UR Board request for new orthotic shoes that was subsequently approved, and determined plaintiff did not require an orthopedic consultation. (Broadwell Aff. (DE 67-1) ¶36).

On June 1, 2015, plaintiff submitted a sick-call request alleging numbness in his hands but plaintiff was a "no-show" at his scheduled appointment. (Broadwell Ex. 24 (DE 68-24) at 2–3).

On July 10, 2015, defendant Mussari assessed plaintiff in response to a June 29, 2015, sick-call request for hand numbness. (Am. Compl. (DE 17) ¶¶27–28). Plaintiff complained of "new onset of numbness of hand" he ascribed to "something pressing on [his] spinal cord." (Broadwell

Ex. 25 (DE 68-25) at 3). Plaintiff requested an extra mattress and an appeal of the UR Board's denial of an MRI. (Id.). On July 15, 2015, defendant Broadwell reviewed defendant Mussari's encounter note and entered no new orders.[17] (Id. at 5).

On August 4, 2015, defendant Mussari assessed plaintiff in response to a July 16, 2015, sick-call request for hand numbness. (Am. Compl. (DE 17) ¶¶30–31). Plaintiff complained his "hands have been numb since April" and they "feel like they are asleep all the time." (Broadwell Ex. 26 (DE 68-26) at 3). Plaintiff stated: "I did play basketball months ago even if I was in pain for exercise but I am not doing any more [due to] numbness and tingling of my hands." (Id.). Defendant Mussari assessed "activity intolerance" and referred plaintiff's complaint to defendant Broadwell. (Id.). On August 12, 2015, defendant Broadwell examined plaintiff on a previously-scheduled "system assessment" to determine if activity restrictions were needed. (Broadwell Aff. (DE 67-1) ¶40). Plaintiff reported hip and back pain but, because defendant Broadwell found all plaintiff's systems were functioning normally, plaintiff was not given any restrictions. (Id.). However, due to his alleged hand numbness, defendant Broadwell scheduled plaintiff for further examination later that same day. (Id.). Although the subsequent examination of plaintiff was unremarkable, defendant Broadwell ordered various lab work and entered a UR Board request to enroll plaintiff in a nerve conduction study and an electromyography ("EMG") study at UNC Neurology.[18] (Id. at ¶41).

---

[17] Defendant Broadwell avers: "as [plaintiff] did not present symptoms that met the guidelines for any of the medical interventions he requested . . . and as I believed his medical condition was being appropriately managed with the medications and interventions previously prescribed I did not enter new orders." (Broadwell Aff. (DE 67-1) ¶38).

[18] The lab work results were normal. (See Broadwell Ex. 27 (DE 68-27)). The UR Board approved plaintiff's enrollment in the nerve conduction study but denied a request for a muscle test. (See id. at 15–18).

On October 20, 2015, plaintiff declared a medical emergency due to back and hip pain. (See Am. Compl. (DE 17) ¶33). Plaintiff was taken to the medical unit where he informed defendant Mussari he was "sitting on the ground doing pull down weights 20 to 30 pounds and [he] felt something pull in [his] lower back." (Broadwell Ex. 28 (DE 68-28) at 2). Defendant Mussari noted no bruising or abnormalities of the lower back but observed that plaintiff's pain increased if he tried to "straighten his lower back," that plaintiff was "afraid to walk," and that he arrived in a wheel chair. (Id.). Defendant Mussari assessed plaintiff with activity intolerance and low back pain. (Id.). Defendant Broadwell entered an order via telephone that plaintiff was to be given an injection of Ketorolac Tromenthamine, a non-steroidal anti-inflammatory medication. (Broadwell Aff. (DE 67-1) ¶43). Plaintiff states that the shot "relieved my pain to some degree because I was soon able to stand and walk with only minimal pain." (Am. Compl. (DE 17) ¶33). Defendant Broadwell also ordered plaintiff a seven-day prescription for the muscle relaxer Flexeril, an ice pack, and temporary use of a wheelchair. (Broadwell Aff. (DE 67-1) ¶43; Broadwell Ex. 28 (DE 68-28) at 3).

On November 16, 2015, plaintiff was a "no-show" for a nurses appointment scheduled after his November 4, 2015, sick-call request. (Broadwell Ex. 29 (DE 68-29)). The request referenced plaintiff's October 20, 2015, back injury and ascribed numbness in his hands to that incident. (Id.).

On January 12, 2016, plaintiff was taken to UNC Hospitals "for a nerve conduction velocity study and EMG."[19] (Broadwell Aff. (DE 67-1) ¶45; see also Am. Compl. (DE 17) ¶36). In the conclusion section, the UNC physician noted it was an abnormal study and stated the following:

---

[19] Plaintiff alleges that, after the tests were conducted, plaintiff asked why his back had not been examined and the physician stated, "[defendant] Broadwell had not mentioned [plaintiff's] back pain." (Am. Compl. (DE 17) ¶36). The record instead reflects a clinical impression noting that plaintiff has a history of low back pain following injury and presents with "several months of new bilateral hand numbness." (Broadwell Ex. 30 (DE 68-30) at 2).

1. There is electrodiagnostic evidence of a mild radial sensory nerve injury bilaterally, given the reduced sensory nerve action potential ("SNAP") amplitudes on the nerve conduction study. However, this change is symmetrical and of indeterminate clinical significance.

2. There is also electrodiagnostic evidence of a chronic median mononeuropathy on the right without evidence of acute injury, such as can be seen in chronic right carpal tunnel syndrome.

Clinical correlation is advised.

(Broadwell Ex. 30 (DE 68-30) at 4).

On January 20, 2016, plaintiff was seen by a nurse in response to a January 13, 2015, sick-call request seeking nerve conduction study results. (Broadwell Ex. 31 (DE 68-31) at 2). The nurse informed plaintiff that, according to the initial report, the study results were normal. (Id. at 3; see Broadwell Ex. 27 (DE 68-27) at 14 (consultant's findings dated January 12, 2016, noting preliminary lab studies show "normal nerve conduction" and "no acute ongoing process in the muscles tested"); see also Am. Compl. (DE 17) ¶37; Broadwell Aff. (DE 67-1) ¶46).

On January 25, 2016, plaintiff filed a grievance generally alleging that defendant Broadwell was deliberately delaying his treatment and had refused to refer plaintiff to a qualified physician as to plaintiff's ongoing back, hip, and hand numbness issues. (See Compl. Attach. (DE 1-1) at 14–16). The responses to this grievance found that plaintiff had been properly treated. (See id. at 17–19).

On February 10, 2016, plaintiff was seen by a nurse for a February 1, 2016, sick-call request. (Broadwell Ex. 32 (DE 68-32) at 2). Plaintiff requested an MRI, complaining of back, hip, buttocks, and leg pain. (Id.). Plaintiff alleged "excruciating pain" he describes as "the worst pain [he] ever had" due to the worsening of his degenerative disc disease. (Id. at 3). Plaintiff asserted the recent tests on his upper extremities were "irrelevant for what's going on." (Id.). Plaintiff asked why he has not been referred to a specialist for his back and hip concerns and requested a cane

because "walking and standing is so painful." (Id.). The nurse assessed "impaired comfort," gave plaintiff Ibuprofen, and referred the chart to defendant Broadwell. (Id. at 3–4). Defendant Broadwell reviewed the nurse's assessment and care and entered no further orders. (Id. at 5; see also Broadwell Aff. (DE 67-1) ¶48) (averring he "was satisfied by the assessment and care rendered by the nurse and in his medical judgment did not believe that any further treatment was warranted at that time.").

On February 24, 2016, plaintiff submitted an "inmate request form" complaining of hip and back pain and requesting "the attention of a specialist" to defendants Daniels and Harrell. (Compl. Attach. (DE 1-1) at 23–26). Plaintiff specifically asked defendant Daniels to "look into the matter." (Id. at 24; see also Defs.' App. (DE 85-2) at 1). In response, defendant Harrell wrote: "in order for you to see a specialist you must follow established sick call procedures. The provider must assess you and submit a UR for you to be referred/see a specialist." (Compl. Attach. (DE 1-1) at 26).

On February 29, 2016, plaintiff filed a grievance asserting that he had written defendants Harrell and Daniel alleging that, since his diagnosis for "degenerative disc," the medications prescribed by defendant Broadwell were ineffective and inadequate. (Defs.' App. (DE 85-2) at 1). Plaintiff identified these ineffective medicines as "flexoral," "naproxen," Tegratol, and Ibuprofen. (Id.). Plaintiff sought the attention of a "qualified trained physician" because defendant Broadwell and the UR Board deliberately denied him "access to be examined by a specialist." (Id. at 1–2). Plaintiff further alleges that his treatment "amounts to cruel and unusual punishment" (Id. at 2). The responses to this grievance found that Pamlico staff was not indifferent to plaintiff. (See id. at 4–6).

On March 2, 2016, plaintiff was seen by defendant Mussari for his February 18, 2016, sick-call request complaining of back, hip, buttocks, and leg pain that interfered with his daily activities. (See Broadwell Ex. 33 (DE 68-33) at 2). Plaintiff again requested to be seen by a "qualified physician" and an MRI. (Id.). Defendant Mussari noted plaintiff's complaints of ongoing numbness in his hands as well as right hip, lumbar spine, and lower leg pain. (Id. at 3). Defendant Mussari also noted plaintiff's history of a weight lifting injuries and his historical x-ray results. (Id.). Defendant Mussari noted plaintiff walked, sat, and stood without facial grimace. (Id.). Defendant Mussari assessed plaintiff with "activity intolerance," provided him over-the-counter Ibuprofen and an analgesic balm that plaintiff refused, and informed plaintiff his chart would be referred to defendant Broadwell. (Id. at 3–4). Defendant Broadwell reviewed defendant Mussari's assessment and care on March 5, 2019, and entered no further orders. (Id. at 5).

On March 6, 2016, defendant Broadwell reviewed plaintiff's chart and "noted that the final report for the nerve conduction study/EMG had been received from UNC on March 4, 2016." (Broadwell Aff. (DE 67-1) ¶49). In his administrative note, defendant Broadwell noted that, although the initial report indicated "normal nerve conduction studies," the final report actually indicated that the studies were abnormal. (See id., see also Broadwell Ex. 34 (DE 68-34) at 2). Due to these results, defendant Broadwell referred plaintiff to be seen at the orthopedic clinic at Central Prison for management of carpal tunnel syndrome. (Broadwell Aff. (DE 67-1) ¶49).

On March 18, 2016, defendant Broadwell assessed plaintiff pursuant to the March 2, 2016, referral. (Broadwell Aff. (DE 67-1) ¶49). Defendant Broadwell noted plaintiff's history of back pain and bilateral hand numbness. (See Broadwell Ex. 35 (DE 68-35) at 2–5). Defendant Broadwell observed plaintiff with defendant Mussari in attendance. (Id. at 5). Defendant Broadwell noted that

plaintiff was: "well-developed, well-nourished, alert, oriented, and in no apparent distress. His gait and posture were normal. [Plaintiff's] back was normal without any signs of scoliosis or lordosis. Waddell testing showed negative axial and better than average axial rotation (normal) . . . . [Defendant Broadwell] observed [plaintiff's] quadriceps reflex was average and equal." (Broadwell Aff. (DE 67-1) ¶49). Defendant Broadwell assessed plaintiff with: 1) chronic non-specific law back pain; 2) Electrodiagnostic evidence of right median neuropathy; and 3) calcification of the right posterior hip of undetermined etiology. (Broadwell Ex. 35 (DE 68-35) at 5). Defendant Broadwell: noted the orthopedic referral pending UR Board approval; ordered x-rays for plaintiff's back and hip;[20] and prescribed 600mg Ibuprofen twice-a-day for 180 days. (Id.). Defendant Broadwell also noted that plaintiff's history of refusing pain medications, engaging in vigorous physical activities like running, weightlifting, and basketball, and failing to show up for scheduled medical visits "reduce the index of suspicion for a serious back pathology such as radiculopathy." (Id. at 7).

On March 29, 2016, x-rays were taken of plaintiff's pelvis and lumbar spine. (See Broadwell Ex. 36 (DE 68-36) at 2–3). The radiologist found plaintiff's pelvis normal but noted degenerative changes manifest by endplate osteophytes at multiple vertebral body levels. (Id.). The radiologist diagnosed plaintiff with moderate lumbar spondylosis. (Id.).

On April 8, 2016, a nurse saw plaintiff pursuant to his April 1, 2016, sick-call request seeking x-ray results. (Broadwell Ex. 37 (DE 68-37) at 2–4). Plaintiff stated, "the x-ray is wrong. How can it say there is nothing wrong [with the hip] when I can feel a bulge right here." (Id. at 3). Plaintiff was advised to await the UR Board decision as to the orthopedic referral request.[21] (Id.).

---

[20] The UR Board approved the x-rays on March 29, 2016. (Broadwell Ex. 35 (DE 68-35) at 8–9).

[21] The UR Board approved the orthopedic consult on May 9, 2016. (Broadwell Ex. 34 (DE 68-34) at 4).

On June 27, 2016, plaintiff was assessed in the orthopaedic clinic at Central Prison. (Broadwell Ex. 38 (DE 68-38) at 2). Plaintiff's main complaint was right-leg pain radiating from his lower back pursuant to an injury three years prior. (Id.). Physical therapy was noted to not be helpful, "naproxen" provided minimal help, and plaintiff stated that "numbness in hands is minimal." (Id.). Plaintiff was not in distress, he had "numbness radiating globally down his right leg" and "globally decreased strength in his right hip flexor and hamstrings," and that his quadriceps strength was "somewhat decreased." (Id.). Although plaintiff asserted global pain in his right lower extremity, plaintiff's straight leg raise test was negative. (Id.; see also Broadwell Aff. (DE 67-1) ¶54 (averring a normal straight leg test is inconsistent with plaintiff's complaints)). Plaintiff's upper extremities were found to be "neurovascularly intact distally." (Broadwell Aff. (DE 67-1) ¶54). Plaintiff was able to make a full composite fist, and "Durkins (a test for carpal tunnel) and Tinels (a test to detect irritated nerves) tests were negative." (Id.). Plaintiff was assessed with low back pain, related sciatica, and "a normal EMG/nerved conduction studies with no evidence of severe carpal tunnel syndrome." (Id.). A UR Board request was entered for a non-surgical evaluation for low back pain at UNC Spine Center, and plaintiff was directed to follow-up with Central Prison Orthopedic Clinic, but no surgery was recommended for plaintiff's carpal tunnel symptoms.[22] (Id.).

On June 28, 2016, defendant Broadwell reviewed plaintiff's chart pursuant to the June 27, 2016, orthopaedic consultation. (Id. at ¶55). Defendant Broadwell determined that, because plaintiff stated that prior physical therapy was ineffective, and because plaintiff had refused other treatment modalities, the UR Board request for referral to UNC Spine Center for physical therapy should be withdrawn. (Id.; see also Broadwell Ex. 39 (DE 68-39) at 2).

---

[22] Although plaintiff asserts he was seen only for his hand numbness at this consultation, not for back or hip pain (Am. Compl. (DE 17) ¶55), this claim is flatly contradicted by the record. (Broadwell Ex. 38 (DE 68-37) at 2).

Also on June 28, 2016, plaintiff was seen by a nurse for two pending sick-call requests seeking new orthotic shoes and inquiring whether the UR Board request had been approved. (Broadwell Ex. 39 (DE 68-39) at 3–5). An examining nurse found no impairment and referred plaintiff's chart. (Id. at 6). Defendant Broadwell reviewed the chart on July 2, 2016, and entered a UR Board request for orthotic shoes that was approved on August 31, 2016. (Broadwell Ex. 40 (DE 68-40) at 2–4).

On July 18, 2016, a nurse saw plaintiff for two sick-call requests. (See Broadwell Ex. 41 (DE 68-41) at 2 (June 27, 2016, request asserting that, although he expected to see an orthopedist for his hip and back, only his hands were examined), 3 (July 7, 2016, request claiming "severe nerve pain" in lower back and hip area and asking to be seen by an orthopedist)). Plaintiff walked slowly into the examination room with a "slight limp" and was "slightly hunched over." (Id. at 5). Plaintiff reported "severe lower back pain" affecting his daily living and causing difficulty sleeping. (Id.). After a normal examination normal with no observed impairment, the nurse referred plaintiff's chart to defendant Boadwell and provided plaintiff Tylenol and an analgesic balm. (Id.).

On July 20, 2016, defendant Broadwell reviewed plaintiff's chart as to the July 18, 2016, sick call and noted: plaintiff had complained of back pain since 2011; plaintiff had received numerous treatments that plaintiff described as ineffective; plaintiff had declined Elavil and Tegretol; while plaintiff was complaining of back pain, plaintiff engaged in vigorous athletic activity including basketball and weightlifting; and, after plaintiff complained of numbness in his hands, plaintiff was referred for tests. (Broadwell Ex. 42 (DE 68-42) at 2). Defendant Broadwell further noted that, although plaintiff's June 27, 2016, orthopedic consult recommended a referral to UNC Spine Center for physical therapy, because the "totality of all the therapeutic modalities offered or attempted

prior–all deemed ineffective by the patient–and in the absence of a true radicular component on the exam, . . . the best course of action at this point is initiate Palmelor."[23]  Defendant Broadwell wrote: "Most reasonable people when in 'pain all the time' . . . that is also affecting sleep, would consent to and appreciate a medication that has a significant chance (based on NNT) to provide relief."[24] (Id.).  Defendant Broadwell prescribed plaintiff Nortriptyline for 180 days and added Tylenol (in addition to Ibuprofen) to plaintiff's medication regimen.  (Id. at 3).  Defendant Broadwell also placed plaintiff on the following activity restrictions: 1) limited to standing for one hour per setting; 2) limited to walking ½ mile per setting; 3) limited to sitting for one hour per setting; 4) limited to lifting 10 pounds; 5) no pushing, pulling, stooping, or bending at the waist; 6) no mopping or sweeping; and 7) no sports activities.  (Id. at 5).

On July 28, 2016, Plaintiff was transferred to Lumberton Correctional Institution ("Lumberton").  (Am. Compl. (DE 17) ¶62).  Plaintiff continued taking Nortriptyline, which he alleges was ineffective, and entered multiple sick calls alleging back and hip pain.  (Id. at ¶¶65–71). On September 29, 2016, a Lumberton provider referred plaintiff for an MRI for his hip and lower back and prescribed "meloxicam and prednisone."  (Id. at ¶71).  Plaintiff asserts: "[t]hese medications actually relieved my pain to a small degree."  (Id.).  Plaintiff received the MRI on December 5, 2016, and was informed the MRI showed "degenerative conditions."  (Id. at ¶¶72, 74; Defs.' App. (D.E. 86-8) (MRI findings of "degenerative changes, most prominent at L4-5.")).

---

[23] Defendant Broadwell avers that Pamelor is a drug also known as Nortriptyline that is prescribed for pain management.  (Broadwell Aff. (DE 67-1) ¶58).

[24] Defendant Broadwell avers: NNT means "number needed to treat"; NNT measures a medication's effectiveness; and Nortriptyline as been noted to be effective under NNT.  (See Broadwell Aff. (DE 67-1) ¶58).

**DISCUSSION**

A.      Plaintiff's Motion to Voluntarily Dismiss

The court first addresses plaintiff's motion to voluntarily dismiss his claims against defendant Mussari. (See Mot. (DE 73)). Federal Rule of Civil Procedure 41(a)(1) allows a plaintiff to dismiss an action voluntarily before the opposing party files an answer or summary judgment motion or by stipulation of the parties. Fed. R. Civ. P. 41(a)(1)(A). Here, because defendant Mussari filed an answer to plaintiff's complaint prior to plaintiff's motion, (see Answer (DE 37)), the dismissal may be effected "only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2).

"The decision to grant a voluntary dismissal under Rule 41(a)(2) is a matter for the discretion of the district court[.]" Davis v. USX Corp., 819 F.2d 1270, 1273 (4th Cir. 1987). The purpose of Rule 41(a)(2) is to "allow voluntary dismissals unless the parties will be unfairly prejudiced." Id. Relevant factors to consider under Rule 41(a)(2) include "the opposing party's effort and expense in preparing for trial, excessive delay and lack of diligence on the part of the movant, and insufficient explanation of the need for a voluntary dismissal, as well as the present stage of litigation." Howard v. Inova Health Care Servs., 302 F. App'x 166, 178–79 (4th Cir. 2008) (quotation omitted).

The court has considered this motion for voluntary dismissal under the governing standard and finds that dismissal of plaintiff's claims against defendant Mussari would be unfairly prejudicial because defendant Mussari's co-defendant Broadwell, the only other named medical provider, had already moved for summary judgment, (see Mot. (DE 64)), and because plaintiff provides insufficient explanation for the need for voluntary dismissal. See Howard, 302 F. App'x at 178–79.

B.      Defendants' Motions for Summary Judgment

1.      Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial.  <u>Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  <u>Anderson</u>, 477 U.S. at 250.

2.      Analysis

Plaintiff alleges that defendants at Pamlico were deliberately indifferent to his serious medical needs in violation of his Eighth-Amendment rights.  (Am. Compl. (DE 17) ¶76).  Plaintiff asserts defendants knew of his serious medical needs but denied and delayed treatment, causing him unnecessary pain by failing to "have plaintiff examined by a trained and qualified physician."  (<u>Id.</u>).

The Eighth Amendment forbids "deliberate indifference" to a prisoner's "serious medical needs."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).  "In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both '(1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials.' "  <u>Strickler v. Waters</u>, 989 F.2d 1375, 1379 (4th Cir. 1993) (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)).  The first prong is an objective one–the prisoner must show that

"the deprivation of [a] basic human need was <u>objectively</u> sufficiently serious"–and the second prong is subjective–the prisoner must show that "<u>subjectively</u> the officials act[ed] with a sufficiently culpable state of mind." <u>Id.</u> (quotations omitted).

"In order to establish a claim of deliberate indifference to a medical need, the need must be both apparent and serious, and the denial must be both deliberate and without legitimate penological objective." <u>Grayson v. Peed</u>, 195 F.3d 692, 695 (4th Cir. 1999). Thus, a prisoner must show that the official knew of and disregarded an objectively serious condition, known medical need, or substantial risk of serious harm. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994); <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016); <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995). A prisoner, however, is not entitled to choose his or her course of treatment. <u>See</u> <u>Russell v. Sheffer</u>, 528 F.2d 318, 318–19 (4th Cir. 1975) (per curiam). Disagreements over medications and forms of treatment concern medical judgments, not the Eighth Amendment. <u>See</u> <u>Estelle</u>, 429 U.S. at105–06; <u>Russell</u>, 528 F.2d at 319. Likewise, mere negligence in diagnosis or treatment does not state a constitutional claim. <u>See</u> <u>Farmer</u>, 511 U.S. at 835 ("[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."); <u>Estelle</u>, 429 U.S. at 105–06 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); <u>Grayson</u>, 195 F.3d at 695 ("Deliberate indifference is a very high standard–a showing of mere negligence will not meet it."); <u>Johnson v. Quinones</u>, 145 F.3d 164, 167–68 (4th Cir. 1998) (finding that negligent acts are not sufficient to establish a constitutional violation).

Assuming, without deciding, that plaintiff satisfies the Eighth Amendment test's objective prong, the court focuses on the subjective prong–whether defendants were deliberately indifferent

to plaintiff's serious medical needs. In making this determination, the court generally may rely on medical records concerning examination and treatment of the inmate. See Bennett v. Reed, 534 F. Supp. 83, 87 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir. 1982); see also, Dulany v. Carnahan, 132 F.3d 1234, 1240 (8th Cir. 1997) ("In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment.").

Contrary to plaintiff's assertions, the record reflects that defendants Broadwell and Mussari took numerous steps to manage plaintiff's medical conditions and his pain. The record does not support plaintiff's claims that he was denied pain relievers or that his care was unduly delayed. Rather, the record reflects that plaintiff received: regular care after sick-call requests; prompt attention after declared medical emergencies; referrals to specialists for orthopedic issues, some of which were approved by the UR Board; an x-ray of his back and two x-rays of his hip; a test for hand numbness; and numerous pharmacological treatments. (See, e.g., Broadwell Ex. 4 (DE 68-4) at 2 (Aug. 15, 2013, six-month prescription for Naprosyn for pain relief); Ex. 8 (DE 68-8) at 7–14 (Sept. 9, 2013, emergency department note for back pain treatment including injection of Toradol, non-steroidal anti-inflammatory medication); Ex. 8 (DE 68-8) at 16 (muscle relaxant Flexeril administered between Sept. 9 and 16, 2013); Ex. 9 (DE 68-9) (Oct. 1, 2013, medical appointment for plaintiff's Sept. 22, 2013, sick-call request); Ex. 14 (DE 68-14) at 2 (Mar. 13, 2014, six-month prescription for Naprosyn for pain relief); Ex. 19 (DE 68-19) at 5 (Oct. 8, 2014, UR Board denial of orthopedic referral request due to plaintiff's "high level of function"); Ex. 21 (DE 68-21) (Feb. 2, 2015, three-day prescription for Toradol and a four-month prescription for Naprosyn); Ex. 28 (DE 68-28) at 2 (Oct. 20, 2015, on-site treatment for medical emergency after weightlifting back injury

including injection of Ketorolac Tromenthamine, a non-steroidal anti-inflammatory medication); Ex. 30 (DE 68-30) at 1–5 (Jan. 12, 2016, UNC neurology nerve conduction/EMG study for hand numbness); Ex. 33 (DE 68-33) at 2 (Mar. 2, 2016, appointment for a Feb. 18, 2016, sick-call request); Ex. 34 (DE 68-34) at 4 (May 9, 2016, UR Board approval of orthopedic consult at Central Prison); Ex. 36 (DE 68-36) at 2–3 (Mar. 29, 2016, x-rays of pelvis and lumbar spine); Ex. 38 (DE 68-38) at 2–5 (June 27, 2016, orthopaedic clinic assessment at Central Prison); Ex. 42 (DE 68-42) (July 20, 2016, prescription of Nortriptyline for 180 days and adding Tylenol (in addition to Ibuprofen) to plaintiff's medication regimen).  The record also reflects that plaintiff declined various treatments for pain, failed to attend scheduled medical appointments, disregarded medical orders as to physical activities, and engaged in vigorous physical exercises all while complaining of severe pain.  (See, e.g., Broadwell Ex. 8 (DE 68-8) at 10 (Sept. 9, 2013, declining injection of Solumedrol, a corticosteroid used to treat inflamation, at emergency department visit for back pain); Ex. 8 (DE 68-8) at 3 (Sept. 12, 2013, healthcare note observing plaintiff engaged in basketball activities three days after both an emergency department visit for back pain and receiving a cane with instructions to limit physical activity);  Ex. 10 (DE 68-10) at 2 (Oct. 31, 2013, healthcare note stating plaintiff lacerated lip while playing basketball); Ex. 10 (DE 68-10) at 4 (Aug. 21, 2014, healthcare note that plaintiff was observed and videoed playing outdoor basketball); Ex. 12 (DE 68-12) at 2 (Jan. 20, 2014, "no-show"for back and hip pain appointment); Ex. 14 (DE 68-14) (July 30, 2014, declined Elavil pain medication due to adverse side effects); Ex. 17 (DE 68-17) (Aug. 6, 2014, declined Tegretol as plaintiff did "not want anymore medication" because these medications provide "only relief from the pain temporarily"); Ex. 24 (DE 68-24) at 2–3 (June 12, 2015, "no-show" at sick-call requested for hand numbness); Ex. 28 (DE 68-28) at 2 (Oct. 20, 2015, treatment note after

declaration of medical emergency stating plaintiff was "sitting on the ground doing pull down weights 20 to 30 pounds and [he] felt something pull in [his] lower back."); Ex. 29 (DE 68-29) (Nov. 16, 2015, "no-show" at sick-call appointment as to Oct. 20, 2015, back injury and hand numbness); Ex. 33 (DE 68-33) at 3) (Mar. 2, 2016, refused analgesic balm although complaining of back pain)). In short, plaintiff's complaint merely reflects his disagreement with the specifics and timing of his treatment regimen.  See Estelle, 429 U.S. at 105–06; Russell, 528 F.2d at 319.

To the extent plaintiff alleges the pain medications provided by defendants were insufficient for his condition, plaintiff does not have a constitutional right to receive specific pain medications. See Russell, 528 F.2d at 318-19; see also Baker v. Stevenson, 605 F. App'x 514, 520 (6th Cir. 2015) (upholding dismissal of a deliberate indifference claim brought by an inmate denied access to opiate medications based on history of substance abuse); Ballard v. Daniels, No. 5:16-CT-3012-BO, 2017 WL 945850, at *5 (E.D.N.C. Mar. 10, 2017) ("A prisoner has no right to be prescribed a particular medication for pain.").  Plaintiff also lacks a right to demand particular medical tests, such an MRI. Estelle, 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.").

To the extent plaintiff asserts that defendants were deliberately indifferent to plaintiff's medical needs by disagreeing with the recommendation of other providers, this claim also fails. Plaintiff notes that, although his requests for an MRI at Pamlico all were denied, he underwent an MRI after his transfer to Lumberton.  (See Am. Compl. (DE 17) ¶72).  Plaintiff also appears to question defendant Broadwell's decision to withdraw a UR Board request for physical therapy at UNC Spine Center that was entered by another physician after plaintiff's orthopedic consultation

at Central Prison on June 27, 2016.  (Compare Broadwell Ex. 38 (DE 68-38) at 2, with Broadwell Ex. 39 (DE 68-39) at 2, and Broadwell Ex. 42 (DE 68-42) at 2)).  However, such disagreements between medical professionals on appropriate course of treatment do not establish an Eighth-Amendment violation.  See United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011).

To the extent plaintiff alleges that his degenerative back condition deteriorated due to allegedly inadequate care at Pamlico, (see, e.g., Pl.'s Resp. Mot. Summ. J. (DE 74-1) ¶63 (noting plaintiff underwent back surgery for nerve root decompression and fusion at L4-5 on July 24, 2018)), the facts of this case, when viewed in the light most favorable to plaintiff, indicate that plaintiff received, at worst, negligent medical care that falls well short of "deliberate indifference to a serious medical need" required to establish a valid constitutional claim.  See Farmer, 511 U.S. at 835; Estelle, 429 U.S. at 105–06; Johnson, 145 F.3d at 167–68; Grayson, 195 F.3d at 695; see also Scott v. Harris, 550 U.S. 372, 378 (2007) (requiring the court to view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party).

The court now turns to plaintiff's allegations that defendants Daniels and Harrell were deliberately indifferent when they did not ensure plaintiff received different medical care.  These administrators responded to plaintiff's grievances.  (See Defs.' Statement of Material Facts (DE 84 ¶¶ 29–30, 35–40)).  Further, because these administrators did not provide medical treatment to plaintiff, (see Daniels Aff. (DE 85-3) ¶10, Harrell Aff. (DE 85-9) ¶10), they were entitled to rely on the expertise of health care providers with respect to the healthcare provided plaintiff.  See Iko v. Shreve, 535 F.3d 225, 242 (4th Cir. 2008) ("If a prisoner is under the care of medical experts . . ., a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." (quotation omitted)); see also Lee v. Young, 533 F.3d 505, 511 (7th Cir. 2008) ("[I]n

27

determining the best way to handle an inmate's medical needs, prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals."). Plaintiff also fails to satisfy the governing standard for a claim premised on supervisory liability. See Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994). Thus, the claims against defendants Daniels and Harrell also fail.

The court now considers plaintiff's assertion that defendant Broadwell "knew he should not be practicing medicine" because defendant Broadwell testified, under oath, in a 1998 trial that he "had a 'permanent brain injury' and [was unable] 'to continue a thriving medical practice.'" (Pl.'s Resp. Opp'n Mot. Summ. J. (DE 74-1) ¶18). Because plaintiff did not raise this claim in his amended complaint, the court will not address it in plaintiff's response to a motion for summary judgment. Even considering this claim on the merits, plaintiff's bald contention that defendant Broadwell "should not be practicing medicine" fails because is directly contradicted by defendant Broadwell's affidavit that he has never been adjudged incompetent, that his license to practice medicine was never restricted, and that his medical license was active at all times in question in this case. (See Broadwell Aff. (DE 80-1) ¶¶1, 3).

In sum, because there is no record evidence that any defendant knew of and disregarded plaintiff's serious medical need, plaintiff has not established that defendants acted with deliberate indifference and cannot satisfy the subjective prong of the Eighth Amendment test. See Matsushita, 475 U.S. at 587; Strickler, 989 F.2d at 1379. Thus, because plaintiff fails to establish a constitutional violation, defendants are entitled to judgment as a matter of law. See Anderson, 477 U.S. at 249.

Alternatively, as government officials, defendants are entitled to qualified immunity from civil damages so long as their "conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). A government official is entitled to qualified immunity when (1) the plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes that the right at issue was not clearly established at the time of the official's alleged misconduct. <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). Here, because there is no showing that defendants' actions violated plaintiff's constitutional rights, defendants likewise are entitled to a finding of qualified immunity.

## CONCLUSION

Based on the foregoing, plaintiff's motion to dismiss his claims against defendant Mussari is DENIED (DE 73), defendants' motions for summary judgment (DE 64, 82) are GRANTED, and plaintiff's claims are DISMISSED. The clerk of court is DIRECTED to close this case.

SO ORDERED, this the 30th day of September, 2019.


LOUISE W. FLANAGAN
United States District Judge